All right, we're going to take one more case and then we'll take a short break. The third case up this morning is number 17-14452, Edgar Llorente v. Elias Gallup Mr. Magado, whenever you're ready. May it please the court, good morning. My name is Patrick Michael Magaro. I represent Edgar Llorente in this case. I think this case is somewhat common and somewhat unique at the same time. This is a classic case of he said, he said. There are two completely diametrically opposed versions of what occurred on the night in question. One from the police officer in question and one from my client, which is a very common scenario. What makes this case unique is I don't normally find myself in the position of being on the side where there is independent, scientific, reliable evidence that corroborates my client's version of the story and simultaneously completely discredits the police officer's version of the story. Well, now that you mention it, there's a problem with looking at all of the stuff that happened at the police station, right? Not only your client's appearance on the video as he was waiting for the breathalyzer, but also the result of the breathalyzer, because aren't you supposed to look at the facts, the context as it existed at the time of the stop or the arrest? Absolutely. However, there's also a principle that I love to invoke when I do trials, which is falsus in uno, falsus in omnibus, which is the proposition that he who lies about one thing may very well be lying about everything, and therefore you can't necessarily trust what that person says. Where the reason why the video and the scientific results become extraordinarily relevant is because there is a disputed issue of what happened on the street at the time of the stop. There's a disputed issue as to what happens in the police station off camera. And then there's a dispute as to what happens on camera. And if we look at what happens on camera and what the police officer writes in his report, which I submit as false, then everything that a jury or a trier of fact can then look at what occurs after and the lies that are told by the officer after and make that as a determination. You may be right that if you get to a jury, you get to put that evidence on. But in determining whether or not a police officer gets qualified immunity, you look only at the set of facts and circumstances that he or she had available at the time of the act in question, right? I would say that you would look only at the undisputed facts, and if, and because I'm- No, you look at the facts in the light most favorable to your client who was a non-moving party, but you freeze frame it at the time of the arrest. That's correct, at the time of the stop and the arrest. Everything else that happens afterwards doesn't govern or isn't relevant to, it may be relevant to ultimate liability, but not to qualified immunity. Is that accurate? That is accurate. In this particular case, once we freeze frame what happens at the time that the police officer is driving behind my client, you have to credit the officer's version of events in order to give qualified immunity. Well, let me ask you this. These are the things that I, in looking at the record, thought were not disputed. You'll let me know if you disagree. Certainly. One, that your client changed lanes four to five times while the officer observed him and before he made a turn. Two, while making the left-hand turn, your client turned into the middle lane. Three, that your client accelerated and decelerated at various times while the officer followed in his police cruiser. Four, your client told the officer that he had come from a club in downtown Orlando and had drunk a beer. Five, your client was shaking while he performed some of the field sobriety tests. And six, your client commented that he was driving around looking for tire shops at three in the morning. You don't contest any of that, right? No, I believe my client did contest that he changed lanes multiple times. And what he did say was that he did speed up and slow down, which is not illegal because the officer was riding in his blind spot and he felt that that was unsafe and he didn't want a car riding in his blind spot. And let me say, I completely understand why he might have done that. But even so, we have to look at whether it was reasonable for what the officer's interpretation of that was, was that a reasonable interpretation by the officer? because the officer obviously is not in your client's head. That's correct. Okay, so the objective facts, as we've just described, are what I've just said, except that your client said he changed lanes only two or three times instead of four or five. Right, and again, if we're freeze framing at that moment in time, then we have perhaps, and I'm not conceding that my client was committing a violation of the traffic code. But we have perhaps, at best, a traffic infraction. And I think there's an abundance of Florida case law that says turning from the left lane into the center lane is not illegal, especially when there's no other cars on the road, as the officer testified in his deposition that there was no one else on the road. But at best, we have, at best, there's a basis for a stop. Now here's where it gets, here's where a stop transforms into a Fourth Amendment seizure. Because the officer at that point is laser focused on arresting my client for driving under the influence. And as my client testified, and I believe the officer conceded, the stop is extended for approximately 20 minutes at the side of the road, which is more than enough time to run a license check, more than enough time to write a summons, the summons aren't even written at the scene. Where we freeze frame here is where the officer says that my client smells stinks of alcohol. I think that was his characterization, that he immediately smelled a very strong odor of alcohol. And that my client failed standardized field sobriety tests. This is what my client adamantly refuses, he refutes. He says he did not fail any sobriety tests. He did not stink of alcohol. Consuming one beer and two hot dogs several hours prior would not justify that. And this is where the later evidence would undercut the officer's position because within a short amount of time, he blows a 0.0 on the breathalyzer. Which in that time frame, there is no way that a person could stink of alcohol as if they were intoxicated. And then shortly thereafter have no alcohol in their system whatsoever. So we freeze frame it at that point because then there's a second Fourth Amendment seizure. Then the third Fourth Amendment seizure is when my client is brought back to the police station and I will be the first to concede my client is an extraordinarily annoying person. That's evident on the video. I've had to deal with him and I understand the officer's frustration in having to deal with an annoying person and it's just a fact of life. But on the video is certainly reasonable minds can differ as to whether he appears intoxicated. Annoyed and annoying, certainly. Maybe I'm misunderstanding your theory of the case. Here's how I see it, right? You have the time that he's initially arrested and then there's a question about whether that arrest was in violation of his rights. You have the time when the breathalyzer comes back blowing a zero and he continues to be detained. And there is a continuing question about that. I think both of those are probably, the first one's based on what we already talked about and the second one is up until that point in time. Then you've got the false prosecution claim, although I think there's a problem with that one. Because by the time that the proceeding actually attaches, which would be the time of the arraignment, he's not in custody anymore and so he's not seized under the Fourth Amendment. So it looks like there are three periods that we're looking at. Am I misunderstanding you? Yes, I believe there's three periods. You do agree, okay. Yes. And those are the three periods? Right. Okay, so you want to address the second period now? I would actually say four, but those are three, yes. And then when we're at the police station, when my client blows zero, not once but twice. He basically says something to the effect of, well, can I go home now? Now the narrative on the officer changes. Now it's not that you're intoxicated by alcohol, but in disbelief, I can't believe this person blew a 0.0 on the breathalyzer. You must be intoxicated by drugs. Give me some urine. And of course, my client consents. The odd part of this is that urine sample is submitted to the Florida Department of Law Enforcement for laboratory analysis. And to this day, the officer still does not accept that. He believes that the Florida Department of Law Enforcement laboratory somehow got it wrong, even though there's independent evidence of that. And he later gave a hair sample. Your client gave a hair sample. He did that independently, yes. Because- What did that show? No drugs at all whatsoever. So what we have is an officer fabricating allegations as he goes along to try and fit a square peg into a round hole to justify this arrest. And at the point that my client blows zero, it is not reasonable for an officer to then change the narrative, despite what he writes under oath later, and say you're now intoxicated by drugs, so I'm going to continue to hold you. At that point, there's only two options. The officer can either let him go or write a summons and let him go. But if my client is not intoxicated by alcohol, and there's no indication that he's intoxicated by drugs, then there's no reason to continue to hold him. That's the second, or I should say, the third seizure. And then we come to the point where my client is booked in. If that's the third seizure, when is the second seizure? At the roadside. At the roadside- Okay, so you're counting the initial stop as the first? Yes. Okay. Stop is a seizure, and then the initial- But you've conceded that the stop, there's arguable PC for. I don't concede that. I believe that there is no probable cause for that. I thought you did during the argument. I'm sorry. That's okay. You said at most. I'm sorry? You said at most. At, right, at most. Even considering, even considering. Right, because there's some, if you look at some of the things that the police officer thought that your client had done illegally, some of those things are not illegal under Florida traffic law. They're not illegal, correct. Changing lanes. Other stuff may give you, they're not in and of themselves illegal, they may give you a base to think something else is up. Right, and at that point- If you change lanes ten times in one block, you might think there's something going on, but the change themselves are not illegal. Exactly, but at that point, it doesn't matter, because once you pull the person over, you can't then start saying, I have some concerns about your driving. Of course, what does that mean at two or three in the morning? That means it's Halloween, I believe you're intoxicated, and I'm going to start administering field sobriety tests. And now I'm going to fabricate the results of those tests. And that's where we have a difference of opinion. So I think when we look at the video, because the officer testifies in his deposition, the video is the way I observed Edgar Lorente on the scene throughout my interactions with him. The district court engaged in judicial fact finding, because once you make the decision that he appears intoxicated on the video, which I believe is not justified, in any event that's something a jury has to make, then everything the officer does is fine. If a jury determines that that's not how he appeared, and the officer is lying about what happened at the time of the stop, what happened at the time of the roadside detention, and what happened off camera, then the entire defense case falls. But either way, these are the classic disputed issues and material fact that can only be determined by a fact finder. I see my time is up. All right, Mr. McGarvey, if you save your time for rebuttal, thank you. How do you pronounce your last name? Mose, Your Honor. Mose, okay. Mr. Mose, whenever you're ready. Thank you, Your Honor. The issue in this case, from our vantage point, is whether or not a reasonable officer who made the observations and perceived the facts of this roadside stop had probable cause, was a reasonable suspicion, I should say, to believe that Mr. Laurenti, driving at 3 in the morning on Halloween night, had some normal faculty of his impaired. Whether it be by drug or whether it be by alcohol. Tell us this, at the time of the stop and the arrest, which is what we look at for qualified immunity purposes, why aren't there genuine issues of material facts in this record? If for no other reason, what the plaintiff says about the failed sobriety test, why wouldn't that create a genuine issue of material facts? I think we first need to look at the Terry stop and then we need to look at the arrest. With respect to this Terry stop, the district court relied exclusively on the deposition testimony of Mr. Laurenti and cited from his deposition his own testimony. That he did not know, he does not recall whether or not he had an illegal left-hand turn. Tell me, cite me one statute, regulation, whatever in Florida that makes it illegal to turn left into a middle lane when there is no traffic. There's a case that we cited in our brief. Not a case. I want to know a statute that says that. It's 316174, I believe, which is what we cited in the court in our brief. What does that provide? That provides that when you enter an intersection to make a left-hand turn, you must make that left-hand turn from the left-most lane and you must turn into the left-most lane. The second part, it says must? You must read the last sentence. It says, whenever practical, you must make that left-hand turn to the closest to the center margin of the road. And that interpretation of the statute- It says exactly that? It does, your honor. It says the last sentence of whenever practical must make it to the center of the intersection. That is a well-enforced traffic infraction or statute within the state of Florida. It has been for years. Doesn't the statute say, whenever practicable, the left turn shall be made in that portion of the intersection to the left of center of the intersection? That is correct. That is the language of the statute. That's different than what you had said. When I've said that when you enter the intersection from the left-hand and you make the left-hand lane change, you must do so to the left-most lane center of the traffic. So you cannot cross to the median, you can't cross to the right-hand lane. Similarly, if you look at the language above, in the first section of that statute, when you make a right-hand turn, you must turn from the right-hand lane to the immediate right-hand lane through closest to the curb. So the legislature has directed that in making these intersectional maneuvers, you must make a left-hand lane change in the left lane and stay within the left lane and a right lane within the right lane. So- I don't see that. That is how the courts of Florida have interpreted it and I believe- There's a case that- There's a case- Holds a traffic citation for driving in the middle lane after a left turn? There's a case that holds a stop for that traffic infraction in the subsequent search which resulted in an arrest. All right, well let's put aside the initial stop. Let's assume that there was enough for the officer to have stopped the car for what he believed were traffic infractions. Okay. Okay, let's assume that that stop is valid, that there's no constitutional violation and that everything that Mr. Llorente alleged goes out the window on that stop. With regards to what happens after the stop, and I think this is what Judge Duvina was asking, the officer testifies that Mr. Llorente failed field sobriety test, right? The officer testified to that, yes. Mr. Llorente denied having had any difficulty with the field sobriety test. He did. That's a clash of testimony on whether or not one of the big indicators about being under the influence exists or doesn't exist, right? I think you need to consider, or should consider, the case of Scott v. Harris where the Supreme Court found, where there is- There's no video here. Where there is video contemporaneous, as the trial court found. No video contemporaneous, because if there's video contemporaneous, then the district court made a double error by considering the video in Mr. Llorente's appearance, but not considering, and expressly refusing to consider, the result of the breathalyzer. You can't have it part way if you freeze frame it so that the only thing that matters is what was available to the officer. Viewed with the facts viewed in the light most favorable to the non-moving party at the time of the arrest, you don't get the benefit of Mr. Llorente's video at the station. And if you do, you gotta bring in the result of the breathalyzer too, because you can't pick and choose what after the fact evidence you rely on and don't rely on. Because the video of Mr. Llorente supports the officer's perspective, and the result of the breathalyzer support Mr. Llorente's perspective. And actually, I watched the video. I'm not even sure the video supports the officer's perspective. Putting that aside, I mean, what happened at the scene is hotly contested by the parties, right? With respect to the performance on the sobriety exercises, it's contested. I don't perceive any other disputed issue of fact with respect to what was observed at the scene. There's an admission. He doesn't say that he performed them? No, no, no. Aside from the field sobriety test, we have a gentleman who stopped at 3 o'clock in the morning. He says he's been at the clubs downtown Orlando. He's in this particular area. He admits that he had just consumed or had consumed an alcoholic beverage. Incidentally, deep breath analysis isn't the same as the odor of alcohol. I know, but he denies that he had odor, right? He denies he had odor, but he says he had a drink. That you have to view the facts in the light most favorable to him. I believe there's record evidence that he denied the odor, but maybe Mr. McGarrel. I think he did deny that he had a strong odor of alcohol on him. I mean, I think your client said he had a strong odor of alcohol about him. Okay. So you have that admission. You have the irregular, as the court described it, irregular if not erratic driving. You do. And the statute speaks to, the deputy is not obligated under the probable cause standard to show that by preponderance of the evidence or more likely than not the gentleman is unimpaired. He does not obligate it to show that the gentleman is under the influence of alcohol. He's obligated to make an assessment in the field without the benefit of scientific tools as to whether or not Mr. Lorente is exhibiting signs of impairment. And if so, whether those signs of impairments could be due to alcohol or drug. And in this particular. When we decide this issue, I've already explained what I think the uncontested facts are and we've heard from Mr. McGarrel that except for the part where I had said four or five lane switches and Mr. Lorente says it's two or three, that those are the uncontested facts in favor of what your client said was the arguable PC. But don't we also have to factor into there the idea that when we look at it in a light most favorable to Mr. Lorente that Mr. Lorente did say that he, in his view he passed all of the sobriety tests, the field tests, and that he contested that his eyes were darting and all of those other things that he was slurring his speech, et cetera. Don't we also have to take that into account when we assess the factors that your client was assessing when he determined there was arguable probable cause? I don't disagree with that standard of review. Although, I think the trial court, the district court found that where there was evidence of video and that video. But we can't look at the video, right? Haven't we already established we can't look at the video? And again, even if we could, I don't really think that the video. When I looked at the video, it didn't look to me like Mr. Lorente appeared impaired. I don't profess to be trained in this area, but he did not come across to me as thick-tongued or slurring his words or anything of that nature. I think that your view of the video is reasonable, as was Judge Conway's view of the reasonableness of that video. So, by definition, you may have a video that's subject to interpretation by two reasonable individuals. Actually three, if you factor in the deputy for that. But you think that video is relevant? I believe the video is relevant, yes. If that's the case, why aren't the breathalyzer tests relevant? Because the breathalyzer test comes in, one, during the DUI stop. But secondly, with respect to the drug, you're talking- Well, the video comes after the stop, too. No, the video is a live recording contemporaneous with the investigation. It is- After he's been arrested. After he's been arrested and transported to, no, not booked, Your Honor. But transported to the DUI testing center. Okay. During the continuation of the investigation. And the breathalyzer is not part of the investigation? The breathalyzer is part of the investigation. But understand- But why isn't it considered, too? It was considered, but the deputy- No, the district court refused to consider the breathalyzer results. Did it not? The district court may have refused to- The district court followed the reasoning of the Berenzia v. Ghee decision, which is you cannot use the results of a laboratory analysis or a breathalyzer test to determine whether or not the deputy making decisions in the field under those conditions as being refuting his judgments. Because he doesn't have them available to him. He didn't have the results available to him. But the court- And how do you know that the way that Mr. Llorente was behaving on the video was the way that Mr. Llorente was behaving at the time of the stop? That's a good question. Because there's no natural law or causal explanation for it otherwise. The video was- But you're viewing the facts in the light most favorable to the officer who says, that's the way I viewed him. That's the way he was acting. That's the way I, why I thought that there was something going on. Deputy's incident and arrest report reflects the same observations that- Right, so you're looking at it in the light most favorable to the officer. As does the technician who operated the equipment. But I believe you have to look back and you have to look at the reality of the contemporaneously made video. In light of the allegations that this deputy fabricated these charges for whatever real purpose. In light of the fact that we have a contemporaneous video that shows the same features, the same characters, the same observations that were made roadside as you now have in the DUI center. And there's a suspicion, a reasonable one, that the gentleman is either under the influence of alcohol, which he has admitted consuming, or a drug, which there's no way of knowing which drug, what type of drug he may be under until we know the laboratory results. I think that that corroborates. And the plaintiff then should have some obligation to prove that this isn't reliable. This isn't- By saying what? By saying what? By explaining his thick tongue speech, by explaining his droopy eyes, by explaining his argumentation. Denied that he had any of that. He's denied that any of that occurred. Can a reasonable judge look at that video and make those observations that they did in fact exist? The same observations that the deputy- That's a fact finder viewing a piece of video and making a qualitative determination about what it showed or did not show that was consistent with what the officer testified to. Doesn't that invert the summary judgment standard? I believe where the court finds that the evidence is of such a quality and is such a degree where there's no question as to what the court is allowed to make those observations and findings based upon objective video evidence. I think that you're right to the extent that if a video objectively contradicts or corroborates testimony, that that is the final word. I just disagree with you that this video does that. Okay. Thank you, Your Honor. And besides, it's not something that was in existence at the time of the original detention. How much time passed between the time of the, at the time the stop ended, where he took him to the DUI center, and the time this videotape began? The stop was reported around 2.47 in the morning. And according to the operator affidavit, the video was started at about 3.45, about an hour. About an hour later. Correct. At which time the influence of alcohol may have dissipated through absorption into the body metabolism. Which meant that he may not have looked the way he looked during the stop. Which doesn't rule out the fact that the deputy was suspicious and had reason to believe there was some other stimulant as he testified. No matter how he would have appeared, it would have been helpful to your client. I'm sorry? If he looks drunk, it's because that's what the officer saw, and that's why the officer arrested him. If he doesn't look drunk, it's because the passage of time has dissipated the effect of alcohol. Well, a law enforcement officer in the field, in the absence of an admission of being drunk, recognizing somebody who's fast speech, who's jittery, who's shaking for no explanation in their car. Who's giving a story of shopping for tires, or at least prospecting for tires at 3 in the morning. And having had one beer. It's difficult in that situation for the deputy to discern, well, this level of impairment, your ability to speak, your ability to reason, your ability to focus is due to a drug or it's due to a- No, there's no doubt about that, and we want police officers doing that to keep our streets safe. There's no doubt about it. But a big part of the picture, not the only part, but a big part of the picture from my perspective is how Mr. Llorente performed on the field sobriety test. Because those tests go a certain way towards confirming what the officer has as a suspicion or saying, there's really nothing else going on. And on that, there's a clash of testimony between the two. Well, I would conclude with this. Based upon the deposition testimony and the record evidence, traffic infractions were issued to Mr. Llorente under 316 Florida statute. By operation of Florida Statute 901.15, a law enforcement officer is permitted, authorized to make an arrest of an individual who commits a violation of 316. Even though that infraction may be imposed by a civil fine that's consistent with the Atwater decision of the Supreme Court, it's consistent with the precedent of the 11th Circuit. At a minimum, and as the judge noted below, probable cause did exist for those citations for which the arrest could have been made. And then the court went on to analyze the charge of the driving under the influence. So, we do have probable cause for an arrestable offense that is in the record. And the judge relied upon the video evidence as being contemporaneous. Certain judges may look at the video and not find those indicators of impaired speech, thick tongue stuttering, or bloodshot eye or droopy eye, but reasonable people may. And that video evidence is within the one hour of Ms. Deputy Gallop's encounter with Mr. Llorente. That video evidence is his demeanor. And Deputy Gallop reasonably believed, under those circumstances, that he had cause to charge. Rather than release him from the DUI Center on Halloween. All right, thank you very much. Mr. McGarver, you have three minutes. I know there's a whole discussion about whether we can rely on the video or not. But that was really the centerpiece of the district court's decision. And the defendant in this particular case married himself to the video and the observations on that video. And what I heard counsel just say is reasonable minds can differ as to whether Mr. Llorente appeared intoxicated or not on that video. Reasonable minds can differ, then that's the very nature that defeats summary judgment completely and totally. And it's contrary to counsel, it's not my burden to come forward with some affirmative proof and explain, because my client did explain, by simply saying that's simply not true. That's not what happened and specifically refuted these allegations. So again, the standard of summary judgment is this has to be viewed in a light most favorable to my client. And this is in the record, but neither myself nor my adversary made a big deal about this in the brief. But before the defendants move for summary judgment, I move for summary judgment. And I think that speaks volumes because I see the case one way and they see the case another. That's the very essence of reasonable minds being able to differ. But to answer the court's question about the timing, looking through the record, the stop is at 2.57 AM. The arrest is at 3.16 AM. The first test, which is on video, is at 4.10 AM, and the second test is at 4.13 AM. So we're talking about short periods of time here. And certainly, obviously, my client's in the custody of police, he's not ingesting any substances. But there's another point that was made that the Florida law permits an arrest for a traffic infraction. And while that may be true, it does not permit a detention. It cannot be booked into a local jail for a civil traffic infraction. And for whatever reason, in this particular case, the three civil infractions were written and docketed separately from the criminal charge, which is the driving while under the influence. All of them were immediately dismissed by the state attorney. But if an arrest is permitted, then all the officer has the authority to do is detain the person, verify their identity, write them a summons, and let them go. So we can't base, and the arrest cannot be saved, and the subsequent detention cannot be saved by the fact that Florida law may give an officer the right to briefly detain someone in order to write a summons. Does not give them the right to hold them for 36 hours and book them into the local jail, especially not on a charge that we claim is completely fabricated. Unless the court has any further questions, I'll rely on the brief and the record. All right, thank you both very much for the argument. It was very helpful. Thank you. We'll take a ten minute break and then pick up with our